IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

PAMELA ANN MILLER,                :
                                  :
        Plaintiff                 :
                                  :
    v.                            :    CIVIL NO. 3:12-CV-01813
                                  :
CAROLYN W. COLVIN, ACTING         :    (Judge Brann)
COMMISSIONER OF SOCIAL            :
SECURITY,                         :
                                  :
        Defendant                 :

## MEMORANDUM

## Introduction

Plaintiff Pamela Ann Miller has filed this action seeking review of a

decision of the Commissioner of Social Security ("Commissioner") denying

Miller's claims for social security disability insurance benefits and supplemental

security income benefits.

Disability insurance benefits are paid to an individual if that individual is

disabled and "insured," that is, the individual has worked long enough and paid

social security taxes. The last date that a claimant meets the requirements of being

insured is commonly referred to as the "date last insured."  Miller met the insured

status requirements of the Social Security Act through December 31, 2013.  Tr. 18, 122.[1]

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.  Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Miller protectively filed her applications for social security disability insurance benefits and supplemental security income benefits on September 18, 2009.  Tr. 16, 124.  Miller claims that she became disabled on March 23, 2009.  Tr. 34.  Miller has been diagnosed with numerous impairments, including major depressive disorder, general anxiety disorder, alcohol abuse, gastroenteritis, gastroesophageal reflux disease, and irritable bowel syndrome.  Tr. 19.  On December 11, 2009, Miller's applications were initially denied by the Bureau of Disability Determination.  Tr. 64, 68.

On January 29, 2010, Miller requested a hearing before an administrative law judge ("ALJ").  Tr. 73.  The ALJ conducted a hearing on December 15, 2010, where Miller was represented by counsel.  Tr. 32-60.   On February 3, 2011, the ALJ issued a decision denying Miller's applications.  Tr. 16-26.  On July 11, 2012,

---

[1] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

the Appeals Council declined to grant review.  Tr. 1.  Miller filed a complaint

before this Court on September 10, 2012.   Supporting and opposing briefs were

submitted and this case became ripe for disposition on March 8, 2013, when Miller

filed a reply brief.

Miller appeals the ALJ's determination on five grounds: (1) the ALJ erred in

using an incorrect alleged onset date, (2) the ALJ mischaracterized Miller's

activities of daily living and relied on those mischaracterizations in finding that

Miller was able to work, (3) the ALJ erred in failing to give greater weight to

Miller's treating physician than a non-treating physician, (4) the ALJ failed to

determine what mental stress accompanied Miller's past relevant work, and (5) the

ALJ erred at step three in finding that Miller's mental impairments did not meet or

equal a listing.  For the reasons set forth below, the decision of the Commissioner

is affirmed.

## Statement of Relevant Facts

Miller is 40 years of age, did not complete school beyond the ninth grade

and does not have a GED; she is able to read, write, speak and understand the

English language. Tr.  41, 127.  Miller's past relevant work includes work as a

cashier and a "stores laborer."  Tr.  56.  Miller's work as a cashier is classified as

light, unskilled work, while her employment as a stores laborer is classified as

medium, unskilled work.  Id.

### A.    Miller's Mental Impairments

Documentation of Miller's mental impairments reaches back to 2006, when she began receiving outpatient treatment from Holy Spirit Hospital.  Tr. 386.  However, Miller's relevant medical history begins in March of 2009, around the time she began treatment for alcohol abuse.  On March 12, 2009, Miller presented to Holy Spirit Hospital for her final appointment before she entered rehab.  Tr. 284.  Miller's therapist noted that she had a disheveled appearance, poor hygiene, a restricted affect, an anxious and depressed mood, and impaired immediate memory.  Id.

On March 23, 2009, Miller presented herself to the Roxbury Treatment Center for inpatient treatment and alcohol rehabilitation.  Tr. 211.  Upon intake, Miller was diagnosed with alcohol dependence, depression, and anxiety.  Tr. 213.  It was noted that Miller appeared unclean and disheveled, but had no suicidal or homicidal ideations; she was assigned a GAF score of 35.[2]  Tr. 213, 216, 237.  Miller also denied any past history of suicidal or homicidal ideations.  Tr. 216.  On March 31, 2009, Miller was given a psychiatric evaluation by Roxbury Treatment Center.  Tr. 229.  At this session, Miller was observed to have a normal tone, rate, and volume of speech, did not appear to be in acute distress, and was dressed

_____

[2] A GAF score between 31 and 40 indicate "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; ... )." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

4

neatly.  Id.  Miller's insight and judgment were "influenced by her addiction but within normal limits," and her memory was intact.  Id.  Miller successfully completed her rehabilitation on April 16, 2009; at the time of her discharge, she was assigned a GAF score of 45.[3]  Tr. 214.

On April 23, 2009, Miller returned to Holy Spirit Hospital for treatment.  Tr. 283.  Her therapist noted that Miller had a normal appearance, good hygiene, and although she was anxious, her mood was generally euthymic with an appropriate affect and no suicidal or homicidal ideations.  Id.  Miller's psychologist, Dr. Elaine Douglas, was surprised to learn that Miller had exited alcohol rehabilitation; previously Miller had denied drinking, even though she apparently had been drinking a twelve-pack of beer each day.  Id.

Miller's next appointment at Holy Spirit Hospital occurred on June 18, 2009.  Tr. 282.  Miller had a normal appearance, good hygiene, a euthymic mood with appropriate affect, and no suicidal or homicidal ideations.  Id.  Miller also reported that her anxiety had decreased.  Id.  On August 27, 2009, Miller returned to Holy Spirit Hospital; she had a normal appearance, fair hygiene, an anxious mood with appropriate affect, and denied any suicidal or homicidal ideations.  Tr. 281.  Miller stated that she was still sober, but had two "slips" where she had consumed a few

---

[3]  A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

beers and thrown up.  Id.  Miller also stated that she was paranoid and depressed at times and felt unlikeable.  Id.

On September 23, 2009, Dr. Douglas noted that Miller had a disheveled appearance and fair hygiene; it was also noted that she had an anxious mood and restricted affect.  Tr. 280.  Miller again denied suicidal or homicidal ideations.  Id. On October 21, 2009, Miller had a good appearance with fair hygiene, a euthymic mood with appropriate affect, and denied suicidal or homicidal ideations.  Tr. 279. Miller noted that she was "not depressed," but was anxious at times.  Id.  Dr. Douglas restarted Miller on Pristiq.  Id.  At her next appointment on November 20, 2009, Miller reported that she was doing well on Pristiq, had a stable mood, and was "out and enjoying herself."  Tr. 278.  Miller had a normal appearance, good hygiene, a euthymic mood with appropriate affect, and had no suicidal or homicidal ideations.  Id.

On December 30, 2009, Miller again had a normal appearance, good hygiene, a euthymic mood with appropriate affect, and lacked suicidal or homicidal ideations.  Tr. 414.  At this appointment, Miller did state that was usually depressed in the mornings and did not "brighten" up until the afternoon. Id.  On March 9, 2010, Miller's new physician, Randy Kaplan, MD, noted that Miller had good hygiene, a euthymic mood with appropriate affect, and no suicidal

or homicidal ideations.  Tr. 415.  Dr. Kaplan noted that Miller's mood was "good" and she had no mood swings.  Id.

Om April 20, 2010, Miller presented to Dr. Kaplan with a disheveled appearance, fair hygiene, a euthymic mood with appropriate affect, and no suicidal or homicidal ideations.  Tr. 416.  Miller stated that she had just woken up, but often went days without proper hygiene.  Id.  Over her final four visits with Dr. Kaplan,[4] Miller consistently had a normal appearance, good hygiene, a euthymic mood with appropriate affect, and denied any suicidal or homicidal ideations.  Tr. 417-19, 497.  Dr. Kaplan also consistently noted that Miller's mood was stable and "good."  Id.  On one occasion, Dr. Kaplan rated Miller's mood as "ok," and on one occasion Miller stated that she was having panic attacks again.  Tr. 417, 419.  At the November 2010 appointment, Dr. Kaplan stated that he was uncomfortable completing a functional assessment form on Miller's behalf.  Tr. 497.

On January 14, 2011, Dr. Kaplan submitted a letter on Miller's behalf.  Tr. 498.  In that letter, Dr. Kaplan explained that he had met with Miller six times during her treatment, and stated that her "GAF score [was] likely greater than 50." Id.  However, Dr. Kaplan opined that he did "not feel she may be able to work fulltime . . . it's unclear if part time work is a more feasible option."  Id.  Dr.

---

[4]  Miller's appointments occurred on June 1, 2010, July 13, 2010, August 17, 2010, and November 29, 2010.  Tr.  417-19, 497.

Kaplan did not provide any explanation or reference any evidence in support of his opinions.

On December 9, 2009 a state agency physician, Soraya Amanullah, Ph.D., completed a mental residual functional capacity assessment for Miller.  Tr. 301-03. Dr. Amanullah opined that Miller was moderately limited in her ability to (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods, and (4) interact appropriately with the general public.  Tr. 301-02.  Dr. Amanullah felt that Miller was not significantly limited in any other respect.  Id.  Dr. Amanullah also noted that stress exacerbates Miller's symptoms.  Tr. 303.  However, despite these limitations, Dr. Amanullah opined that Miller was capable of asking simple questions and accepting instructions.  Id.  Dr. Amanullah also believed that Miller could manage the mental demands of many jobs not requiring complicated tasks and was "able to meet the basic mental demands of competitive work on a sustained basis."  Id.

Finally, Dr. Amanullah opined that, in terms of "paragraph B" criteria, Miller suffered from mild restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining

concentration, persistence, or pace, and had suffered from no repeated episodes of decompensation of extended duration.[5]  Tr. 314.

### B.     The Administrative Hearing

On December 15, 2010, Miller's administrative hearing was conducted.  Tr. 32-60.  At that hearing Miller testified that her main issue was paranoia, and "every time I go somewhere I have to have somebody with me."  Tr. 41.  However, she also testified that she suffered from anxiety and depression.  Tr. 46.  Miller testified that she wakes up every morning at six o'clock to send her children off to school; she then takes her pills and sometimes dozes off until her son returns home around one o'clock in the afternoon.  Tr. 42.  Miller stated that she only leaves her house two to three days a week and mostly stays in her room where she feels safe. Tr. 43, 49.  She did testify that she has very few friends, but that she has friends at church, which she attends with her family regularly.  Tr. 50.  Miller also stated that she had tried to kill herself "a couple times" in the past and still has suicidal thoughts once or twice a week.  Tr. 45, 48.

After Miller testified, Brian Bierley, an impartial vocational expert, was called to give testimony.  Tr. 56.  The vocational expert testified that Miller had past relevant work as a cashier and a "stores laborer."  Id.  He further stated that

---

[5]  "Repeated episodes of decompensation, each for an extended duration" means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. 20 C.F .R. pt. 404, subpt. P, app. 1 § 12.00(C)(4).

work as a cashier required interaction with the general public, while work as a

stores laborer did not.  Tr. 56-57.  The vocational expert testified that an individual

with marked limitations in her ability to maintain attention and concentration for

extended periods of time would "be fired after a while," while a person with only

moderate limitations would be able to perform unskilled work.  Tr. 57.

## Discussion

In an action under 42 U.S.C. § 405(g) to review the Commissioner's

decision denying a plaintiff's claim for disability benefits, the district court must

uphold the findings of the Commissioner so long as those findings are supported

by substantial evidence.  Substantial evidence "does not mean a large or

considerable amount of evidence, but 'rather such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" Pierce v.

Underwood, 487 U.S. 552, 565 (1988), quoting Consolidated Edison Co. v.

N.L.R.B., 305 U.S. 197, 229 (1938). Substantial evidence has been described as

more than a mere scintilla of evidence but less than a preponderance.  Brown v.

Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed factual

record substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being supported

by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. § 404.1520; Poulos v. Commissioner of Social Security, 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has

the residual functional capacity to return to his or her past work and (5) if not,

whether he or she can perform other work in the national economy. <u>See</u> 20 C.F.R.

§ 404.1520.   The initial burden to prove disability and inability to engage in past

relevant work rests on the claimant; if the claimant meets this burden, the burden

then shifts to the Commissioner to show that a job or jobs exist in the national

economy that a person with the claimant's abilities, age, education, and work

experience can perform.   <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).

### A.   Step Three

At step three of the sequential evaluation process the ALJ concluded that, if

Miller stopped her substance abuse, she would not suffer from an impairment or

combination of impairments that met or medically equaled the severity of a listed

impairment.  Tr. 21-22.  Miller argues that the ALJ erred in finding that her mental

impairments did not meet or equal listings 12.04 (affective disorders) under the

"paragraph B" criteria.

To be considered disabled at step three of the sequential evaluation process,

an impairment or combination of impairments must meet or medically equal an

impairment listed in the Social Security Administration's Regulations. <u>Williams v.</u>

<u>Sullivan</u>, 970 F.2d 1178, 1186 (3d Cir. 1992). "'For a claimant to show that his

impairment matches a listing, it must meet *all* of the specified medical criteria. An

impairment that manifests only some of those criteria, no matter how severely,

does not qualify.'" <u>Williams</u>, 970 F.2d at 1186, quoting <u>Sullivan v. Zebley</u>, 493

U.S. 521, 529–30 (1990) (emphasis in original).  In order to meet the 12.04

listings, a claimant must establish that she or he suffers from an affective disorder

and that the disorder causes at least two of the following "paragraph B" criteria: (1)

marked restriction of activities of daily living, (2) marked difficulties in

maintaining social functioning, (3) marked difficulties in maintaining

concentration, persistence, or pace, or (4) repeated episodes of decompensation,

each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

The ALJ concluded that if Miller stopped using alcohol, she would not meet

any of the four criteria.  Tr. 21.  The ALJ found that Miller suffered from only

minor restrictions in her activities of daily living since she consistently had a

normal appearance and good hygiene at her psychiatric treatments, had an

improved ability to maintain her personal care, could prepare simple meals, wash

dishes, drive her daughter to school and the library, shop for groceries, and count

change.  Tr. 21.

The ALJ also found that Miller had moderate difficulties in social

functioning.  <u>Id.</u>  The ALJ noted that Miller wanted someone with her whenever

she left the home.  <u>Id.</u>  However, the ALJ also found that Miller was able to drive

her daughter to school and the library, was able to go grocery shopping, and

attended her medical and psychiatric appointments.  <u>Id.</u>

The ALJ further found that Miller had moderate difficulties with her concentration, persistence, or pace.  Id.  The ALJ stated that after Miller stopped drinking, her memory, thoughts, affect, and functioning all improved.  Id.  The ALJ found it significant that Miller admitted her mood had improved and was stable, that she no longer experienced mood swings, and that her sleep had improved.  Id.  The ALJ did not believe Miller had any limitations in her persistence or pace, but believed she had moderate limitations in her concentration. Id.  Finally, the ALJ found that, after Miller had stopped drinking, she had suffered from no episodes of decompensation that lasted for an extended duration.  Tr. 21-22.

These findings mirrored the conclusion of Dr. Amanullah in the mental residual functional capacity assessment that had been completed in December of 2009.  Tr. 279-95.  There, Dr. Amanullah also opined that Miller suffered from mild limitations in her activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and had suffered from no episodes of decompensation since she stopped drinking.  Tr. 314.

The ALJ cited to substantial evidence in support of his findings for each of the various criteria.  Significantly, only one doctor of record, Dr. Amanullah, offered an opinion on the impact that Miller's mental impairments had on the four

paragraph B criteria.  The ALJ's opinion mirrored this medical opinion, and Miller

cannot cite to any medical opinion contradicting the ALJ's conclusions.  To be

certain, there is at least some evidence suggesting that Miller was more limited in

activities of daily living and social functioning than the ALJ believed her to be.[6]

However, the evidence cited to by the ALJ, such as Miller's daily activities and

improved functioning, is adequate to support his conclusions.  Pierce v.

Underwood, 487 U.S. 552, 565 (1988).  Therefore, the ALJ's determination at step

three of the sequential evaluation process is supported by substantial evidence.

### B.     The Alleged Onset Date

Miller next argues that the ALJ committed reversible error by analyzing

Miller's disability using the wrong alleged onset date.  Miller originally claimed an

alleged onset date of December 13, 2008, but at her administrative hearing she

amended that date to March 23, 2009.  Tr. 34, 109.  Nonetheless, the ALJ

conducted an analysis using the December 2008 alleged onset date.  Tr. 16.  Miller

argues that this resulted in the ALJ using evidence of alcohol use to find that she

was not disabled.  The Commissioner in turn argues harmless error.

In this case the ALJ conducted a dual analysis of Miller's impairments; one

analysis focused on Miller's limitations while using alcohol, and one analysis

---

[6]  For example, Miller sometimes needed reminders to bathe, comb her hair, and change her
clothing, and needed others to cook some of her meals.  Tr. 145-46.  Miller also stated that she
usually did not shower more than once a week.  Tr. 173.

focused on Miller's limitations after she had ceased using alcohol.  Tr. 19-25.

While the ALJ used the phrase "if the claimant stopped the substance abuse," it is

clear from the opinion that the ALJ conducted his analysis based on evidence of

Miller's condition and mental impairments after she stopped drinking.

At step three, after finding that Miller was disabled while using alcohol, the

ALJ found that after "the claimant stopped the substance abuse" she did not meet

listing 12.04 or 12.06.  Tr. 21.  In reaching this conclusion, the ALJ cited almost

exclusively to evidence that was generated after Miller had stopped using alcohol.

The only time the ALJ cited to earlier evidence was to reinforce the point that

many of Miller's daily struggles had related to her alcohol use.  Tr. 22.  The ALJ

undertook the same analysis at step four.  Tr. 22-25.  Since the ALJ based his

analysis and ultimate conclusion on evidence and facts that existed in the record

after Miller ceased using alcohol, the ALJ's conclusions would be no different is

he had used the correct alleged onset date.  Consequently, the ALJ's error was

harmless, and remand is not warranted.  See <u>Perkins v. Barnhart</u>, 79 Fed. App'x

512, 515 (3d Cir. 2003) (finding harmless error where the ALJ's mistake "would

have had no effect on the ALJ's decision.").

### C.    The ALJ's Characterization of Miller's Activities of Daily Living

Miller further argues that the ALJ mischaracterized her activities of daily

living and then relied upon those mischaracterizations in finding that Miller was

16

still able to work.  Miller first challenges the ALJ's "mistaken" assertion that

Miller drives her daughter to school and work every day.  Tr. 21.  Miller had not

explicitly stated that she drove her daughter to school and the library every day.

However, Miller did state that she went outside "once or twice daily" in order to

"take [her] daughter to school and sometimes to [the] library."  Tr. 156.  Miller

further stated that her only mode of transportation when she went out was driving

or riding in a car.  Id.  A reasonable inference from this evidence is that Miller did

in fact drive her daughter to school every day, particularly in light of the fact that

Miller lived alone with her children at least through August of 2009.  Tr. 281.

While the ALJ did not expressly lay forth these inferences, they are readily

available for the Court to draw from the ALJ's opinion[7] and the ALJ's statement

was not a mischaracterization of these facts.

Additionally, contrary to Miller's assertions, the ALJ cited and considered

nearly every fact that Miller lists in her brief.  The ALJ noted that Miller claimed

she was unable to remain awake for long periods of time; that she shakes all the

time; and that she becomes paranoid around other people.  Tr. 23.  The ALJ stated

Miller alleges others needed to cook and clean for her and had difficulty focusing.

Id.  The ALJ cited to Cathy Renaud's (a friend of Miller) assertions that Miller had

---

[7] E.g., Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989) ("As a reviewing court, we are
not deprived of our faculties for drawing specific and legitimate inferences from the ALJ's
opinion.  It is proper for us to . . . draw inferences . . . if those inferences are there to be drawn.").

difficulty walking, remembering, completing tasks, concentrating, and following instructions.  Id.  The ALJ noted that Renaud claimed Miller required reminders to perform her daily activities, and often went a full week without changing her clothes or bathing.  Tr. 23, 25.  However, the ALJ also cited to other evidence, such as Miller's ability to prepare simple meals, wash dishes, drive her daughter to school and the library, shop for groceries, and count change.  Tr. 25.  The ALJ also noted that Miller's psychiatric records indicated that after she stopped using alcohol, her appearance was normal and her hygiene was generally good.  Tr. 21. The ALJ chose to give more weight to certain facts than others; as such, the ALJ did not mischaracterize or ignore the relevant fact, and no error was committed in the ALJ's recitation of facts.

### D.    Weight Given to Miller's Treating Physician Opinion

The preference for the treating physician's opinion has been recognized by the United States Court of Appeals for the Third Circuit and by all of the federal circuits.  E.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).   In choosing to reject the evaluation of a treating physician, an administrative law judge may reject treating physician's opinions outright only on the basis of contradictory medical evidence.  Id.  A treating physician's opinion must be given controlling weight where that opinion is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 CFR § 404.1527 (d)(2).

However, not every statement or opinion offered by a treating physician is a "medical" opinion. "Opinions on some issues, such as [a statement by a medical source that you are 'unable to work'], are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner . . ." 20 C.F.R. § 404.1527(d). The Commissioner will not, and is not required to, give any "special significance to the source of an opinion on" whether an individual is able to work. Id.

Here, the ALJ rejected Dr. Kaplan's opinion that Miller may not be able to work full-time. Tr. 24. In doing so, the ALJ correctly noted that this was a decision reserved for the Commissioner, and Dr. Kaplan's opinion was not entitled to any controlling weight or special significance. Id. Consequently, the ALJ would not have erred even if he had rejected Dr. Kaplan's opinion outright without explanation. Nonetheless, the ALJ explained the Dr. Kaplan's opinion was afforded little weight because it was conclusory, provided very little explanation for its ultimate conclusions, and because it was inconsistent with Dr. Kaplan's own findings that Miller's mood was good and stable, her anxiety attacks were less frequent, and her clinical findings were longitudinally normal. Id.

The ALJ also found Dr. Amanullah's opinion that Miller retained the ability "to meet the basic mental demands of competitive work" more persuasive. Id.

The ALJ found Dr. Amanaullah's opinion persuasive because it was consistent with the medical evidence or record, and because Dr. Amanullah is a "highly qualified psychologist" who is an expert in her field.  Id.  Therefore, even if Dr. Kaplan's conclusory statement could be considered a medical opinion, the ALJ did not err in choosing to reject that opinion in favor of the state agency consultant's opinion.  See, e.g., Morales, 225 F.3d at 317 ("Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit . . ."); Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011) (Finding that "[s]tate agent opinions merit significant consideration" and therefore, the ALJ's decision to give greater weight to the consultant than to the treating physician was supported by substantial evidence where the ALJ properly considered both opinions).

### E.   Mental Stress Accompanying Miller's Previous Relevant Employment

At step four of the sequential evaluation process, the ALJ concluded that Miller retained the residual functional capacity to perform work at all exertional levels, but was limited to understanding, remembering, and carrying out simple instructions, and could only occasionally interact with the general public.  Tr. 22. In reaching this conclusion, the ALJ relied in part on the opinion of Dr. Amanullah.  Tr. 24.  Dr. Amanullah opined that Miller retained the ability to "manage the mental demands of many types of jobs not requiring complicated

tasks." Tr. 303.  Miller does not challenge this residual functional capacity

assessment, but argues that the ALJ did not properly consider the stress associated

with her past relevant work as a stores laborer.

The ALJ found that work as a stores laborer was consistent with Miller's

residual functional capacity.  Tr. 25.  Specifically, the ALJ noted that the

Dictionary of Occupational Titles ("DOT") states that this position requires no

more "than the capacity to remember, understand, and carry out the simple

instructions consistent with unskilled work . . . [and] does not require more than

minimal interaction with the public."  Id.  The DOT places the job of stores laborer

firmly within the bounds of a position that does not require complicated tasks.  The

DOT places the language and math skills required by this job at the lowest level,

and places the reasoning required at the second lowest level.  DICOT 922.687-058.

By incorporating the DOT and Dr. Amanullah's opinion into his ultimate

conclusion, the ALJ did properly account for any stress accompanying the position

of stores laborer, and properly concluded that Miller's mental impairments did not

prevent her from engaging in this past relevant work.

## Conclusion

A review of the administrative record reveals that the decision of the

Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. §

405(g), the decision of the Commissioner affirmed.

21

An appropriate Order will be entered.


BY THE COURT:

s/Matthew W. Brann
Matthew W. Brann
United States District Judge

Dated: May  19, 2014